[Opinion delivered March 10, 1886.]

---

## [No. 1994.]

### JACK THORNTON *v.* THE STATE.

1. EVIDENCE — EXECUTIVE PARDON.— Judgments of conviction in two felony cases were introduced by the defense to support objection to the competency of a material witness for the State. The State met the objection by producing the charter of pardon issued by the Governor. The defense objected that the knowledge of the facts to which he proposed to testify was acquired by the witness after his conviction and before his pardon, and that the Governor did not have the power to qualify the witness to testify to facts which came to his knowledge while a convict. *Held*, that the objection was without merit, and that the admission of the evidence of the pardoned convict did not infringe the rule as to *ex post facto* laws.

2. PRACTICE — ALIBI — CHARGE OF THE COURT.— See the opinion for a charge of the court upon the defense of *alibi*, *held* correct.

3. SAME — EVIDENCE.— The statutory rule which prohibits a conviction upon the uncorroborated testimony of an accomplice does not apply to the uncorroborated testimony of a felon whose competency to testify has been restored by pardon, and even the granting of a new trial because the conviction was had upon such questionable evidence is a discretionary power conferred upon the trial court, and should be used largely with reference to the nature of the crime of which the witness had been convicted.

4. SAME — CHARGE OF THE COURT.— However correct may be the doctrine that the evidence of a pardoned convict is entitled to but little credit, an instruction to the jury to discredit his testimony or to receive it with suspicion would, under the practice of this State, be error.

5. MURDER — EVIDENCE — BURDEN OF PROOF.— If, upon a murder trial, it becomes a material question whether blood found upon the clothing of the defendant is human blood or animal blood, the *onus* of having the same analyzed devolves upon the party who seeks to use the presence of the blood as a material fact in the case. A judgment of conviction, however, cannot be reversed merely because the prosecuting counsel, in his argument, erroneously contended that the duty of analyzing the blood devolved upon the defendant.

6. SAME — FACT CASE.— See the statement of the case for evidence *held* sufficient to support a conviction for murder in the first degree.

Appeal from the District Court of Fort Bend. Tried below before the Hon. W. H. Burkhart.

The indictment in this case charged the appellant with the murder of his wife, Maria Thornton, in Fort Bend county, Texas, on the 9th day of April, 1884. His trial resulted in his conviction of murder of the first degree, and his punishment was affixed at a life term in the penitentiary.

C. W. Purnell was the first witness for the State. He testified that in April, 1884, he was a deputy sheriff of Fort Bend county. On or about the 9th day of that month the witness was notified by one Dan Allen of the death of the girl Maria. He repaired immediately to the point indicated by Dan Allen, and there found the body of the deceased lying in an old field about one hundred yards distant from an old house. Her throat was cut from ear to ear, and her clothes were very bloody. The ground near the point where the body lay indicated a recent struggle. At several points between the old house and the body the witness found distinct traces of blood, there being more blood at a place about twenty steps from where the body was lying. The defendant was at the body when the witness arrived. He manifested no distress over the death of his wife. Witness observed a little blood on defendant's hat, and some on his shirt, and called his attention to it. A little later the witness observed that the defendant was wearing an old apron, in an evident effort to conceal the blood on the shirt. He asked defendant how the blood got on his shirt, and he replied that it came from a hog he had killed. On that evening the witness arrested the defendant, and also Anderson Watkins, Wake Rector and Wade Hunter, and confined them in jail. Hunter, Rector and Watkins were discharged upon the examining trial. Rector and Watkins were brothers-in-law to the defendant, and Wade Hunter was his nephew. Quite a crowd of negroes were about the body when the witness arrived. A short time before the death of the girl Maria, the witness arrested the defendant upon a charge of seduction. Defendant gave an appearance bond to secure his attendance upon the district court of Fort Bend county, which was to convene on the fourth Monday in April, 1884. The body lay at a point in the field some seven or eight hundred yards from the house of old Jack Thornton, the defendant's father, and about three hundred yards from the Brazos river. Dan Allen's house was about four hundred and fifty yards from where the body lay, and on the opposite side of the river. A few small bushes and some undergrowth intervened between the body and Dan Allen's house, but one could see

from one point to the other. The blood from the deceased girl's throat appeared to have spurted considerably at the point where a struggle was indicated by the condition of the ground. Defendant was a slender stripling at the time of the death of his wife. She was a small girl.

C. M. Ferguson, district clerk of Fort Bend county, identified indictment number 1790 as an indictment returned by the grand jury of Fort Bend county at the October term, 1883, charging the defendant with the seduction of Maria Glenn, the deceased. The said indictment was then read in evidence, and the witness read from the minutes of the court, of May 13th, the entry of the dismissal of the same by the State upon the ground of the defendant's subsequent marriage to the injured party.

Chaney Glenn, the mother of the deceased, testified, for the State, that she last saw her daughter, the deceased, alive on the morning of Wednesday, April 9, 1884. Deceased left witness's house on that morning to go to Richmond for the purpose of marrying the defendant. On the next day the witness saw her dead body in what was known as the old "Nolen field." Her throat was cut from ear to ear and her clothing was very bloody. The deceased then had a baby about seven months old, the paternity of which was generally attributed to the defendant. The baby was found in the old house known as Jack Menken's house, about one hundred yards from where its dead mother lay. It was still alive, but so very weak it could scarcely cry. The deceased was living with the witness at the time of her death, but had lived with the family of the defendant's father. Witness's house was about a mile distant from the house of old Jack Thornton, defendant's father, at which house defendant lived, but it was on the opposite side of the river. The deceased went to see the defendant on April 8th, the day before her death, about going to Richmond. Early on Thursday morning, the day after the marriage of defendant and deceased, defendant and his sister Caroline came to a point on the river opposite the witness's house, and called the deceased. The witness told defendant that the deceased was not at her house, and had not been there since the morning before. Defendant said that on the evening before he told her to go home, fix up her things and have them at the river on that morning, when he would take them and her to his father's house, where he was staying. Defendant then promised to go in search of the deceased, and left, ostensibly for that purpose. About 11 o'clock on that day witness went to old man Jack Thornton's house, and found the defendant at work in the field. She told him that her daughter was

missing, and that he and the others must turn out and help hunt for her. Defendant then left the field with Wake Rector and Wade Hunter to hunt for the deceased. On Thursday morning the witness, in company with Jack Menken, met Louis Williams in Colonel Ellis's pasture. This was about 11 o'clock. Louis Williams was on horseback. The body of the deceased was found near the trail which led from old man Jack Thornton's house to the witness's house, via the Menken crossing. The deceased went to defendant's house on the day before, and was married to the defendant. Henry Williams went with her.

Henry Williams testified, for the State, that on Tuesday, the second day before the body of the deceased was found, the latter went to the defendant's house to get married. Witness went with her. They met the defendant and his brother Mitchell in the field. The deceased told defendant that she was ready to go to Richmond. The defendant, in reply, told the deceased that the horses were out; to go back home and return the next day, when they would go to Richmond and get married. The deceased went on up to the house, and the witness lingered about the place where they met defendant and his brother Mitchell. When the deceased had passed out of earshot, witness heard Mitchell Thornton say to the defendant: "Jack, you can kill her to-morrow." Defendant replied: "That is all right." Defendant then turned to witness and told witness that he would keep coming to the field until he got himself killed. At that time the witness saw a razor in the defendant's pants-pocket. Witness did not tell the deceased of this occurrence. He first told it to Ida Ella Smith, her mother and father, and John Glenn, with whom witness lived. He did not tell them until after the killing. Witness did not know at the time what defendant and Mitchell Thornton were talking about.

Patsey Mills testified, for the State, that she saw the defendant and the deceased on their way home from Richmond after their marriage on Wednesday. They passed witness's house in the evening, the defendant a quarter of an hour ahead of the deceased. He rode by witness's house in a lope, and was whistling.

Anderson Watkins testified, for the State, that the defendant and the deceased passed by his house on their way home from their marriage. Defendant did not get down, but when he got to witness's house he called to the deceased to go on home that night, and to have her things at the river on the next morning, and that he would get them and her, and take them to his father's house, where he was then living. On the next morning, when it was announced

that the deceased was missing, the witness, his wife, defendant, old man Jack Thornton and his family turned out to hunt for the deceased. Witness and his wife went towards the old house in the field, and the defendant and the others went to the river lower down. The deceased's babe was found in the old house, and her body was found in the field about seventy-five yards from the old house. Witness then went to the river and reported his discovery to Chaney Glenn, the deceased's mother, and Chaney repaired to the body. On his return to the body, the witness found the defendant and other searchers present. The body was found about half a mile from the trail which led from old Jack Thornton's house to the river crossing. Witness remained with the body until nearly sundown, when he started home. On his way home he met Mr. Charley Purnell, and returned with him to the body. Witness was at the body while Henry Smith was there. Henry Smith asked the defendant why he did not run away. Defendant replied that he had done nothing for which he should run away. Smith was the only person present who undertook to persuade the defendant to flee. Purnell arrested the witness on that evening. Witness lived within half a mile of old man Jack Thornton. He knew of no hogs being killed at Thornton's on Tuesday evening.

J. W. Harper testified, for the State, that he was present in the county clerk's office on Wednesday, April 9, 1884, when defendant and deceased were married. At the conclusion of the marriage ceremony, the defendant asked Judge Somerville where he could get a divorce from the deceased. When informed by several that he could not get a divorce, the defendant appeared worried and angry. The deceased said that she did not want a divorce. Defendant had on his soiled working clothes. Witness was close to the defendant when the marriage ceremony was performed, but saw no blood on his shirt. H. Oglesby and H. L. Somerville testified to substantially the same facts stated by Harper.

Henrietta Allen testified, for the State, that she was the wife of Dan Allen. She lived at the Brown place on the bank of the Brazos river. On Tuesday the deceased told witness that she was going to be married to the defendant on Wednesday,— the next day. About sundown on Wednesday evening the witness saw the deceased, on the opposite side of the river, walking towards the old Menken house, with her baby in her arms and a bundle in her hand. The baby wore a white bonnet. The defendant followed her at a distance of about one hundred yards. They were then about two hundred yards distant from the old Menken house. The witness told

her husband, Dan Allen, and John Glenn, about seeing the defendant and deceased on that evening. Glenn came to witness's house on Thursday and told witness that deceased did not go home on the night before. Witness told Glenn about seeing the deceased and defendant on the same evening not long after she saw them. She did not mention the matter to her husband until the next day.

Louis Williams was next tendered as a witness for the State. The defense objected to his competency as a witness upon the ground that he was then a convict, serving sentence under two convictions for forgery. To support the objection certified copies of the records of the district court of Caldwell county, showing his conviction in two cases for forgery, his sentence under the said convictions, and the records of the penitentiary showing his confinement in the same under his sentences, were introduced by the defendant, and proof adduced that at the time of the death of the deceased the defendant was in the employ of Colonel S. A. Ellis, under contract with the State. The State met the objection by producing the charter of pardon, issued by the Governor, extending to the proposed witness full pardon in both cases, the said pardon reciting that the convict had served nearly the whole of the combined terms, and that the pardon was granted upon the recommendation of the district attorney, who desired to use the said convict as a witness in important cases. The defense persisted in its objection, but the objection was overruled, and the said Louis Williams was held to be a competent witness.

The witness testified that he knew the defendant and knew the deceased in her life-time. The witness last saw the deceased alive on the evening of April 9, 1884, in an old field in Colonel Ellis's pasture, when the witness was riding through the pasture hunting mules. The deceased was then going down the trail through the field, in the direction of the river crossing. The defendant, whittling on a stick, followed some seventy-five yards behind the deceased. Witness heard them talking after he had passed the defendant some seventy-five yards, and he also heard the defendant speak to some one across the river. Defendant and deceased were both walking when witness saw them, the deceased having her baby and a shawl in her arms. Witness passed deceased and defendant at a point nearly opposite Dan Allen's house. Witness rode on by old man Jack Thornton's house, and was hailed by Jack Thornton, Senior, who told him that the defendant and the deceased were married on that day. Witness remarked that he had just met them, and that if he had known of defendant's marriage he would have deviled him about it. Witness remained talking with old Jack some fifteen minutes.

During that time witness heard some one screaming, the screams coming from the vicinity towards which defendant and deceased were going when witness passed them. Witness asked old man Jack what the screaming meant, and he said that it was merely somebody hallooing. Witness then left old Jack, with the remark that he would see if any one had fallen into the river. He started towards the point from which he thought the screaming came. When he had gone down the river two or three hundred yards, witness heard Mr. Ransom and Caswell Ellis coming with the mules, and soon fell in with them, but left them again in the old Nolen field, witness going up and Ransom and Ellis down the river. Witness did not pass the old Menken house after he separated from Ransom and Ellis. Witness was out in the pasture on the next morning, his business being that of stock-minder for Colonel Ellis. On that morning he met Chaney Glenn and Jack Menken. Chaney asked witness if he had killed her daughter. Witness told her that he had not, and told here where he saw the deceased and the defendant on the evening before. Chaney and Menken were then going in the direction of old Jack Thornton's house.

The defendant was in his working clothes and in his shirt sleeves when the witness saw him and deceased in the pasture on the evening before the discovery of the body. Witness passed deceased and defendant on that evening about three hundred yards from old Jack's house. It was between six and seven hundred yards from old Jack's house to the Menken house. The sun was about an hour high when witness passed deceased and defendant on the evening in question. Timber was growing between the point where witness passed them and Dan Allen's house, but there was a gap through which a person could see from one point to the other. Witness denied that he told P. B. Fowler that he said nothing about meeting the defendant and deceased in the pasture until after he was accused of the murder. He denied that he told Fowler that he did not see the defendant have either a knife or razor when he passed him. He did tell Fowler that he did not know whether deceased was whittling with a knife or a razor. Witness denied that he told Eaton, at his house, that he did not see either the defendant or the deceased in the pasture on the day the latter was supposed to have been killed. Witness told Chaney Glenn and Jack Menken, on the next morning, and Mr. Bertrand on the evening of the next day, that he saw the defendant and the deceased in the pasture on the evening when the murder is supposed to have been committed.

Henry Smith was the next witness for the State. He testified

that defendant and several other parties were about the body when witness reached it. From the body the witness, defendant, Wake Rector and Wade Hunter went over the trail leading to the body, and examined the ground. Witness asked defendant where the first cutting was done. He pointed out a place and said: "The first cutting was here." He then pointed out another place and said: "She fell here. Whoever killed her must have started to carry her body to the bayou." Witness said in reply: "Yes." Wade Hunter, Wake Rector, Ki Autry and Anderson Watkins heard the conversation in which these statements were made. In the presence of the same parties witness charged defendant with the murder of the deceased. He did not deny the charge, but said nothing and looked down. Witness then asked him why he had not run off. He replied: "I did not know where to go." Witness said: "That's so, Jack; you don't know any place to go except to Richmond and to Ike Peoples's." At this point of the conversation, Hunter and Rector said that defendant's father had offered the defendant, on the night before, $100 and the best horse he had, to enable him to escape, and tried to persuade him to leave the country. The witness testified, on the examining trial, but did not then swear that, in his conversation with the defendant at the body, he asked defendant where he supposed the first cutting was done, and that defendant pointed out a place and said that he supposed the first cutting was done there, and then pointed out another place at which he supposed the second cutting was done. Witness did not testify on the examining trial that he asked the defendant how he accounted for the removal of the body from the bloodiest part of the ground, as there was no drag, and that defendant replied that he did not know how to account for it, nor that witness then told defendant that it looked as if the person who killed her had started to carrying her body to the bayou, and that the defendant said: "Yes, it looks so." Witness denied that he told Judge J. W. Parker, near the court-house, on the day of the trial, that he, witness, asked the defendant "how he was going to get out of this thing," and that the defendant replied that, since he was not in it, he had no occasion to get out of it. Witness denied that, in front of Bassett & Blakeley's store in Richmond, he told Wade Hunter and Wake Rector that they ought to swear on the trial that the defendant killed the deceased, in order to purify their reputations in the community.

Ellis Jones testified, for the State, that, at the body, he saw some blood spots on the defendant's hat, and some small blood spots on his shirt. Witness's attention was called to the blood on defend-

ant's hat by Mr. Purnell's question to defendant respecting the manner in which he got it on his hat. To that question the defendant replied that he "reckoned it was not blood, but was a scorched place." There was a scorched place, and a blood spot as well, on the defendant's hat. Purnell then called defendant's attention to the blood spots on his shirt, and asked how they came there. He replied they came from two hogs which he helped to kill two days previous. Defendant showed no distress over the death of his wife, but said that it hurt him to be accused of her murder. Defendant had an apron about his shoulders. Witness was looking closely for every little circumstance that would throw any light on the murder. Wade Hunter and Wake Rector did not tell Henry Smith, in the hearing of the witness, that the defendant's father, on the night before, offered the defendant a hundred dollars and his best horse, and tried to persuade him to leave the country. Henry Smith and the defendant did not have a conversation at the body that witness heard, in which Smith asked the defendant where the first cutting, etc., was done, as testified by Henry Smith. Witness heard no conversation of the kind related by Smith.

Elder Menken testified, for the State, that he went with Chaney Glenn to Ellis's pasture on the morning that the body was found. They went to old man Jack Thornton's field about 10 o'clock, meeting Louis Williams on the way. Defendant and all of Thornton's family were working in the field. Chaney hallooed to the defendant that her daughter was missing, and that all hands must turn out and hunt her. Witness returned home.

Jake Sullivan, for the State, testified that he was at Letitia Smith's house on the night of the day that the defendant and the deceased were married. Defendant came to Letitia's house, walking, after dark. He told Letitia, in the witness's presence and hearing, that he was troubled, and had worked none on that evening, but had been asleep under an oak tree in the woods, all evening.

Sophie Smith testified that the defendant came to the house of her mother, Letitia Smith, between sundown and dark on the evening of his marriage. He came on horseback. Letitia asked him if he was married. He replied that he was, and that he married against his will, but was going to get a divorce when the district court met. He said that he was troubled; that he left his wife on the court-house steps and went to the woods, where he lay down under a tree and had slept all evening. Defendant then brought Letitia a bucket of water and rode home. Jake Sullivan was not present at the conversation between defendant and Letitia. He

came just as defendant was leaving, and told defendant that he wanted a talk with him. Defendant answered that he was in a hurry and could not talk. Defendant was as lively as usual on that occasion. He appeared in no wise strange. He left singing a song common among the convicts working in the neighborhood. Witness observed no blood about his clothes or person.

Letitia Smith testified substantially as did the witness Sophie. She explained that Jake Sullivan arrived at her house while defendant was gone to the lake to get her a bucket of water. Sullivan heard none of the conversation between witness and defendant. Quite a number of convicts were at work around old Jack Thornton's house at the time of the murder.

Charity Thomas testified, for the State, that she was present at the marriage of the defendant and deceased. Defendant, as soon as the ceremony was over, said that he wanted a divorce and talked to Judge Somerville about getting one. Judge Williams told witness to talk to the young couple and try to get them reconciled to each other. Witness accordingly followed defendant and deceased out of the court-house, and on reaching the corner of the court-house found the deceased in tears. Witness asked her what was the matter, and she replied: "Jack has threatened to kill me this evening." Defendant said: "Yes, I said so, and I meant what I said, and I won't take it back." The witness remarked to deceased: "He is joking; go home and live like white folks." Defendant was apparently very angry. The State closed.

P. B. Fowler was the first witness for the defense. He testified that at the last term of the district court he heard the witness Louis Williams tell Lawyer Parker that when he met the defendant and deceased in the pasture, defendant was walking along the trail forty or fifty yards in the rear of deceased, twirling a small stick, and that if defendant had a knife or razor he, Williams, did not see it. He also told Parker that he did not tell any one of having met the defendant and deceased on that evening, until after he was accused of the murder. During his conversation with Parker the witness Williams became very restless and uneasy, and in fact showed signs of conscious guilt.

William Eaton testified, for the defense, that, at a festival at his house, some time after the killing, he asked the witness, Louis Williams, about having met the defendant and deceased in the pasture on the evening of the killing. Williams said that it was not true that he saw them in the pasture on that evening, and that he knew nothing about their being there.

Jack Thornton, defendant's father, testified, for the defense, that he came to Richmond with defendant and deceased when they were married, and bought the license for them. Witness was perfectly willing for the marriage to take place. Witness, defendant and deceased left the court-house together after some talk between defendant, Judge Somerville and others about a divorce, to which witness paid no attention, thinking that the white folks were joking the defendant. The witness separated from defendant and deceased in the town of Richmond, and the witness saw no more of deceased until he saw her dead body. The defendant and the deceased left town before the witness did, and witness did not overtake them. When witness got home, he found that defendant had eaten his dinner and was at work in the corn field. Witness, after getting his dinner, started to join defendant at work in the field, when the convict Louis Williams rode up from the inside of Colonel Ellis's pasture. Witness and Williams talked at the fence perhaps fifteen minutes. Williams asked some question about the defendant, and witness said: "Jack is married." Williams replied: "If I could see him I would devil him about it." Witness then pointed out the place where defendant was at work, and told Williams that he could see him by riding down the fence. About this time the approach of some white men, with a bunch of horses, was heard, and Williams left, going towards them. Witness then went to the field where defendant was at work, and the two worked until nearly dark. They went home together, when defendant got his horse and went to Letitia Smith's. He returned within the next hour and went to bed. Defendant did not dress up when he went to get married, but wore the same clothes, including the shirt, he had on the day before, when he and some other boys killed two hogs for witness. Williams said nothing to witness about seeing defendant and deceased in the pasture. Witness heard no hallooing or screaming while Williams was at his house.

Lucy Watkins was the next witness for the defendant. She testified that defendant and deceased came to her house after their marriage on Wednesday evening. Defendant went on home, and deceased ate her dinner at witness's house, some time after which, a girl having brought her baby to her, the deceased got across the fence into Colonel Ellis's pasture and started home. Witness heard defendant tell deceased to be at the river early on the next morning when he would transfer her and them to his father's house.

E. E. Ransom testified, for the defense, that he and Caswell Ellis were in the pasture on the same day that the convict Williams

claimed to have met defendant and deceased. They passed within two hundred and fifty yards of the old house in which the baby was found. They sent. Williams up the river and went down it themselves, and finding the horses they were looking for they returned over the trail on which Williams claimed to have met the defendant and the deceased. They were separated from Williams not longer than forty minutes. Witness did not see either the defendant or the deceased on that day. The trail described could not be seen from Dan Allen's house, according to witness's recollection. The view between the two points, the witness thought, would be obstructed by a growth of trees on a second bank of the river. At all events it would require an extraordinary eye-sight to identify a person that distance, or to determine whether at that distance a child had on a bonnet or a handkerchief. Witness heard no screaming in the pasture on that evening. Witness had known old Jack Thornton for years as a man of exemplary honesty and truthfulness. He had known the defendant, since his birth, as a remarkably industrious, hardworking, quiet and thoroughly reliable boy. Louis Williams as a convict was an exceptionally good and attentive man to his business, and was entirely trustworthy.

Dan Allen testified, for the defense, that John Glenn came to talk to him about this case. He told the witness that if he, witness, would know something about the case, he, John Glenn, would divide all of his future earnings with him. After John Glenn had talked with witness's wife, she told witness about seeing defendant and deceased across the river on Wednesday evening. Witness never before heard his wife speak of seeing defendant and deceased on Wednesday evening until after John Glenn talked to her. Witness became satisfied in his own mind that John Glenn had succeeded in over-persuading his, witness's, wife.

Cross-examined, witness stated that he was unwilling to testify that his wife had sworn to a lie, but he believed that she had been over-persuaded by John Glenn. After some hesitation witness said that his wife, on the night of the killing, but after John Glenn had been to see her, told him about seeing defendant and deceased in the pasture. Witness was not at home when Glenn talked to his wife about the matter. Witness told his wife not to go to court and testify to facts she knew nothing about. He also told her that he knew Glenn had over-persuaded her.

Wade Hunter, for the defense, testified that he saw the defendant when he started to Richmond to get married. He saw the defendant working in the field after his return from Richmond. Defend-

ant wore his every-day clothes to his wedding. Witness was at the body soon after it was found. He heard Henry Smith tell the defendant to run off. Defendant replied that he had done nothing to run from, and was not going. The witness did not tell Henry Smith that the defendant's father offered him a horse and a hundred dollars, and tried to persuade him to flee the country. No such conversations between Smith and defendant occurred at the body of the deceased as those detailed by the witness Henry Smith when on the stand. Henry Smith, in June, told witness and Wake Rector, in front of Bassett & Blakeley's store in Richmond, that they ought to swear on the trial that the defendant killed the deceased in order to benefit their reputations in the community. Witness, Wake Rector and the defendant killed two hogs on Tuesday evening. Witness and Wake dragged the larger of the two carcasses to the scalding vat, and defendant carried the smaller to another vat. They butchered the meat, salted it and put it away.

Wake Rector testified, for the defense, substantially as did the witness Wade Hunter, and in addition that he saw the defendant at work in the field throughout the evening after his return from his wedding. During the same time, and while defendant was at work, witness saw some one at a distance whom he took to be the deceased.

Sydney Thornton, defendant's mother, testified in his behalf that upon his return from Richmond on Wednesday, when he was married, the defendant ate dinner and went direct to the field to work. Deceased came to witness's house shortly after defendant went to work, stayed a short while, and left, going towards her father's house. Defendant and Caroline Rector went to the river on the next morning to meet the deceased and bring her and her things to the witness's house. Defendant, Wade Hunter and Wake Rector killed two hogs on Tuesday evening. The defendant did not change his shirt on the next day, but was married in the same one he wore when he killed the hogs. He started to wear the same pants, but witness and his father persuaded him to change pants, as the ones he had on were entirely too bloody and soiled by his work with the hogs to wear to town. Louis Williams rode up to witness's house just as old man Jack Thornton was starting to the field to join defendant at work. They talked a few minutes and Williams left.

Caroline Rector testified, for the defense, that she lived at the house of her father, old man Jack Thornton. Deceased came to the house after her marriage, and after defendant had gone to work in the field. Witness could see the defendant and the others at work

in the field while deceased was at the house. Witness stayed at home on that evening to prepare a room for occupation by the defendant and the deceased. On the next morning the witness went with the defendant to the river to meet the deceased. Defendant called across the river to Chaney Glenn's to know if the deceased was at home. Chaney replied that she was not, and that the convicts had killed her, and asked the defendant to go down the river and examine a white object there in the water. Defendant went to the point indicated, and thence to some parties in a boat, and asked if they had seen the deceased. Defendant, Wade Hunter and Wake Rector killed two hogs on Tuesday. Defendant wore the same shirt to town he had on when he killed the hogs, but changed his pants. Defendant had on, when arrested, the same shirt he wore at the wedding, and which he had on when he killed the hogs.

John Brown testified, for the defense, that he had been jailer during the larger part of defendant's confinement. Defendant had been a quiet, tractable boy, and had never taken advantage of many opportunities to escape.

Mitchell Thornton testified, for the defense, that he and defendant were at work together when the deceased and the boy Henry Williams came to the field. Neither defendant nor witness had a razor. Witness did not say to the defendant: "Jack, you can kill her to-morrow." Caroline Rector and others worked all of that evening in the field with defendant.

Judge Parker testified, for the defense, that he represented the defendant as counsel on the examining trial. The State's witness Henry Smith told witness that, in talking with the defendant at the body of the deceased, he asked defendant: "How are you going to get out of this?" and that defendant replied: "I am not in it, to get out."

R. H. Earnest testified, for the defense, that at the time of the examining trial he was county attorney of Fort Bend county, and as such represented the State. He used his utmost endeavor to secure every particle of evidence for the State to be had. Henrietta Allen was not a witness upon the examining trial, and witness never heard of her in connection with the case until upon this trial. John Glenn labored earnestly and actively in tracing up testimony, but he never once mentioned Henrietta Allen's name to the witness. Old man Jack Thornton brought some fresh meat to show the witness, but the meat did not appear to the witness to be as fresh as the old man represented it to be.

Ki Autry, testifying for the defense, denied that the defendant

and Henry Smith had, in his presence, any such conversations at the body as the said Henry Smith testified to when on the stand as a witness for the State. He denied that Wade Hunter or Wake Rector said to Smith, in his presence, that defendant's father had offered him a hundred dollars and a horse, and tried to induce him to flee. Henry Smith did, however, charge defendant with the killing. Defendant said nothing in reply, but looked down.

The defense then read from Henry Smith's statement upon the examining trial, as follows: " While at the body, I asked the defendant where he supposed the first cutting was done. He pointed out a place and said: 'It looks as if the first cut was made here.' He then pointed out another place, and said: 'I think the second cut was made here.' I asked the defendant how he accounted for the body being removed from where the most blood was, and told him I could see no blood and no drag. He said that he did not know. I told the defendant that it looked like whoever killed her started to carry her body to the bayou, and he said, 'Yes, it looks so.' "

Willis Hayes testified, for the defense, that he was in the courthouse when the defendant and the deceased were married, and talked to deceased, defendant and his father, until they left the courthouse. Witness did not see Charity Thomas on that day, and she was not in the court room when the marriage ceremony was performed. If Charity Thomas saw the defendant and the deceased at all, she saw them after the witness left. The defense closed.

William Bertrand testified, for the State, in rebuttal, that Louis Williams, on the day or on the day after the body was found, told the witness that he saw the defendant and the deceased in Ellis's pasture on Wednesday evening. Witness had heard of the murder and that Williams was in the pasture on the evening that the murder was supposed to have occurred, and saw the defendant and the deceased.

Louis Williams testified, for the State, that no inducements of any kind were offered him to testify in this case. He knew absolutely nothing about his pardon until it was handed to him.

The motion for new trial raised the questions discussed in the opinion.

*Parker & Pearson* filed an able brief and argument for appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

HURT, JUDGE. Jack Thornton, the appellant, was indicted in the district court of Fort Bend county for seducing Maria Glenn. On

the 9th day of April, 1884, Maria, in the town of Richmond, married the appellant. On the 11th of April, 1884, she was found dead in an old field known as the "Nolen field," near the Brazos river, with her throat cut from ear to ear. For this homicide Jack Thornton was arrested, indicted, tried and convicted of murder of the first degree, his punishment being assessed at confinement in the penitentiary for life.

Upon the trial the State introduced as a witness Louis Williams, who had been convicted of two felonies. Defendant objected, and adduced in evidence, in support of his objection, two certified copies of the judgments of the district court of Caldwell county, showing convictions and sentences in two cases of forgery. This objection was met by the State by the introduction of pardons by the Governor. Defendant still objected to the competency of Williams, because he says that a pardon cannot relate back and enable the witness to testify to facts which occurred after conviction and before pardon; that the Governor has no power to restore competency to a witness to testify to facts coming to his knowledge while a convict. The court below overruled the objection and Williams testified to material facts against defendant; to all of which defendant excepted and reserved his bill.

We cannot possibly comprehend how the fact that a witness was, at the time he perceived the facts, a convict, can affect his competency, if competent when he relates them to the jury. Being a convict, and hence incompetent at that time, certainly would not in any way affect his powers of perception. He could perceive, grasp and retain the facts as well, being a convict at the time the facts transpired, as if no taint had ever attached to him. Being pardoned and hence competent when offered as a witness, his incompetency when the facts were observed cannot possibly affect the question.

Nor does the admission of facts in evidence observed by the witness when a convict impinge the rule as to *ex post facto* laws. The rules of evidence are not altered; less or different testimony than the law required at the time of the commission of the offense, in order to convict, is not received and held competent to convict defendant. Each and every fact sworn to by Williams was admissible by law when it occurred, and by the reception of the evidence of Williams no less testimony is held sufficient to convict than was required at the time the offense was committed. (Cooley's Const. Lim., p. 322.)

There was evidence tending to prove an *alibi*, and upon this subject the court charged as follows: "That if they (the jury)

entertained a reasonable doubt of the presence of defendant, Jack Thornton, at the place Maria Thornton was killed at the time of the killing, and if you entertain a reasonable doubt that at the time the defendant was not there but elsewhere or at his own house, then the defendant would be entitled to the benefit of such doubt, and in such case you will acquit him." The objection to this charge, made by defendant, is " that it was so constructed and couched in such vague language that a jury could not interpret the same to defendant's benefit."

This is a very plain, clear and pertinent application of the law to the facts in the record bearing upon *alibi*, and is without objection.

Counsel for appellant requested the court to charge the jury that the defendant could not be convicted upon the testimony of an ex-convict unless corroborated by other evidence. This was refused.

While Mr. Greenleaf says that a pardon granted after the prisoner has suffered the entire punishment awarded against him restores his competency, though he would in such case be entitled to very little credit, yet it does not follow, under our practice, that it would be the duty of the trial judge to so instruct the jury.

Our *statute* prescribes that a *conviction* shall not be had upon the uncorroborated testimony of an accomplice, and this should be given in charge to the jury; but we have no such rule as to a conviction upon the uncorroborated testimony of an ex-convict. If, however, a conviction should be obtained alone upon the testimony of an ex-convict, the court, in the exercise of a sound discretion, might grant a new trial. This would depend largely upon the nature of the crime for which the witness had been convicted.

In this case the witness Williams, though a pardoned convict, was most cogently corroborated. In fact, if he had not been introduced at all, the testimony of the other witnesses, if not sufficient to sustain the verdict, makes a very strong case against defendant.

In closing the argument the district attorney stated to the jury " that it was the duty of defendant and his counsel to have the blood on defendant's shirt analyzed, so as to explain to them whether it was human or animal blood; and also, in referring to one of defendant's counsel as county judge, who, controlling the county finances, should have had this analysis made." If there was doubt as to whether the stains on defendant's shirt was the blood of a human being, before this (the stains) could be used as a fact against him, they should have been analyzed and clearly shown to have been the blood of a person. The duty of making the analysis rests upon the party desiring to use the fact. But we certainly cannot reverse a

judgment because the district attorney was in error as to who,—
which party,— should assume the duty of making the analysis. The
best of lawyers err with regard to the burden of proof.

It is urged by counsel that the court erred in overruling the
motion for a new trial, for the reasons heretofore considered, and
because the verdict is contrary to the law and the evidence. We do
not think so; for, in the light in which we view the testimony, the
law and evidence warrant the verdict and judgment. The evidence
we think very clearly supports the verdict, and, if necessary, this is
susceptible of moral demonstration.

The judgment is affirmed.

*Affirmed.*